**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

---

NATHAN BARNETT and PHILIP BARNETT,

     Plaintiffs,

-against-

CABELL COUNTY COMMISSION; and
ANTHONY CUMMINGS, GREG LOSH,
KIMBERLY PACK, MIKE PARDE, EDDIE
BLANKENSHIP, in their individual
capacities;

     Defendants.

No.  3:22-cv-00203

**COMPLAINT AND JURY
DEMAND**

---

**PRELIMINARY STATEMENT**

1. Nathan and Philip Barnett are brothers who collectively spent 18 years in prison for a murder they did not commit before being exonerated by DNA evidence.

2. Their wrongful convictions at the ages of 25 and 28, respectively, robbed Nathan and Philip of the primes of their lives.

3. Their agony over their lost years is compounded by the knowledge that police and prosecutorial misconduct led to their wrongful convictions.

4. No forensic or physical evidence ever connected Philip or Nathan to the crime.

5. They were not even suspects for more than four years.

6. But years after the police investigation grew cold, an informant with an extensive criminal history claimed to police that his nephew, Brian Dement, a man who struggled with mental health issues and who later recanted his false allegations, had confessed to being involved in the murder.

7.      The informant told the West Virginia State Police ("State Police") that Dement had implicated three other young men in the crime: Philip and Nathan Barnett and Justin Black.

8.      Members of the State Police coerced false confessions from Dement and Black, implicating Nathan and Philip in the killing.

9.      The State Police held Dement and Black in the police barracks overnight, threatened them, and fed them nonpublic information about the crime.

10.     The State Police eventually extracted three coerced confessions from Dement, a heavy drug user with significant cognitive impairments.

11.     Dement's confessions were as inconsistent with each other as they were implausible on their face.

12.     Dement tried to disavow his false statements but was threatened with a longer prison sentence by the State and eventually accepted a plea deal.

13.     Black recanted his false confession two weeks after he made it.

14.     Even though they had been excluded as contributors to the DNA found at the crime scene, Philip and Nathan were indicted and arrested for murder.

15.     The Prosecuting Attorney then compounded the wrongdoing of the police by withholding exculpatory evidence important to Nathan and Philip's defense.

16.     Only one witness other than Dement claimed to have seen Nathan and Philip with the victim on the supposed night of the murder—a man named William Scott Harbour, who the prosecution identified as a witness the night before he testified.

17.     The Prosecuting Attorney failed to disclose that Harbour had multiple open criminal cases at the time and had been offered favorable consideration for his testimony.

18.     The Prosecuting Attorney also concealed that Dement's uncle was a police informant who had received favorable treatment for sharing tips in the past.

19.     Despite the lack of evidence, Nathan and Philip were convicted of murder.

20.     In 2017, new DNA testing run on semen found on the interior of the victim's pants and on cigarette butts found near her body again excluded Philip and Nathan as matches.

21.     This time, however, the DNA profile matched that of a violent sex offender who was then incarcerated in Ohio on different charges.

22.     That man, whom Nathan and Philip have never met, is the true perpetrator of this homicide.

23.     On the basis of this DNA evidence, Philip and Nathan's convictions were overturned, and the State dismissed its charges against them.

24.     Philip and Nathan now demand justice for the unconstitutional deprivation of their liberty and derailment of their lives.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and allege the deprivation of constitutional rights.

26.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Venue lies in this Court under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of West Virginia.

## JURY DEMAND

28.     Plaintiffs demand trial by jury.

## PARTIES

29.     Plaintiff Nathan Barnett is a 39-year-old man. He is a citizen of the United States and resides in Point Pleasant, West Virginia.

30.     Plaintiff Philip Barnett is a 41-year-old man. He is a citizen of the United States and resides in Monroe, Georgia.

31.     Defendant Cabell County Commission is a municipal corporation organized under the laws of the State of West Virginia, *see* W. Va. Code § 7-1-1, with its offices in Huntington, West Virginia.

32.     Defendant Anthony Cummings was at all relevant times a Sergeant in the West Virginia State Police, acting under color of state law. He is sued in his individual capacity.

33.     Defendant Greg Losh was at all relevant times a Trooper in the West Virginia State Police, acting under color of state law. He is sued in his individual capacity.

34.     Defendant Kimberly Pack was at all relevant times a Trooper in the West Virginia State Police, acting under color of state law. She is sued in her individual capacity.

35.     Defendant Mike Parde was at all relevant times a Corporal in the West Virginia State Police, acting under color of state law. He is sued in his individual capacity.

36.     Defendant Eddie Blankenship was at all relevant times a Corporal in the West Virginia State Police, acting under color of state law. He is sued in his individual capacity.

37.     Defendants Cummings, Losh, Pack, Parde, and Blankenship are hereinafter referred to as the "Individual Defendants."

38.     Defendant West Virginia State Police is a state agency that, at all relevant times, was the employer of the Individual Defendants. The allegations in this complaint against Defendant West Virginia State Police are expressly limited to those found in paragraphs 362-369.

## FACTS

### I. The Murder of Deanna Crawford

#### A. *A Gruesome Discovery on Remote Hickory Ridge*

39.     On August 8, 2002, at approximately 1:00 p.m., a logging crew working along Hickory Ridge, a rural area of Cabell County, made a tragic discovery.

40.     The crew found a young woman's body under a dilapidated barn-like structure on an abandoned farm.

41.     Several members of the State Police were called to investigate the scene, including Defendant First Sergeant Anthony Cummings, among others.

42.     The victim's body was so decomposed that she could not initially be identified.

43.     Based on fingerprints, the victim was later determined to be 21-year-old Deanna Crawford.

44.     Ms. Crawford was found on her back, naked from the waist up. Her arms were raised over her head, and she had abrasions on her heels and the bottoms of her feet.

45.     Near her body, the state troopers found leopard print pants, cigarettes, and cans of beer and chewing tobacco.

46.     Given the placement of her body, her injuries, and the fact that she was found partially nude, investigators posited that she had been sexually assaulted and dragged along her back.

47.     The medical examiner concluded, based on extensive damage to the bone and cartilage of Ms. Crawford's right hyoid, located below the chin at the front of the neck, that the cause of death was manual strangulation.

48.     The medical examiner estimated that, by the time Ms. Crawford's body was discovered on August 8, she had been dead between three to five days.

49.     Because there was no semen detected on the victim's pants at the time, the rape kit was left unexamined.

50.     Male DNA was detected on other evidence from the crime scene, but investigators could not determine its source.

### B. The Investigation Runs Cold

51.     The State Police spoke to nearly 100 family members, friends, and acquaintances of Ms. Crawford during the investigation into her death.

52.     Investigators determined that Ms. Crawford was last seen on August 4, 2002, at 9:00 p.m. entering a black car at a convenience store, and they obtained surveillance footage taken from the store that night.

53.     In the course of the early investigation, State Police knocked on the door of the home of Vetina Baylous, the mother of Justin Black.

54.     Philip Barnett, who answered the door, stated that he and Black had held a "keg party" on August 5, while Baylous was away.

55.     Finding no connection between the party at Ms. Baylous' house and the murder, State Police declined to pursue that line of investigation.

56.     Eventually, the State Police excluded all the suspects they had identified, and the leads dried up.

57.     After approximately six months, the State Police ceased actively investigating the case.

## II. Five Years Later, The Case Is Reopened

### A. An Informant Comes Forward

58.     In early January 2007, around four and a half years after Ms. Crawford's body was found, a man named Gregory Alan Bailey came forward with what he believed to be valuable information about the case.

59.     Bailey approached Jim "Jimbo" Schiedler, who was then a Cabell County Deputy Sheriff. Bailey said that he had heard his nephew, Brian Dement, implicate himself and three other friends in a murder on Hickory Ridge.

60.     Bailey was a local man with a long criminal record; he had served three years in prison for drug-related offenses, and had also been convicted on multiple DUIs, battery, and disorderly conduct charges.

61.     Hoping to avoid spending time in prison ever again, Bailey had built a relationship over the years with Deputy Schiedler by working periodically as a criminal informant.

62.     Bailey would provide information to Deputy Schiedler relating to alleged criminal activity in Cabell County.

63.     In return, Deputy Schiedler would contact Cabell County Prosecuting Attorney Christopher D. Chiles to arrange favorable consideration with respect to criminal charges Mr. Bailey faced.

64.     As Bailey puts it, Deputy Schiedler would help him "out of jams" when he could supply useful information.

65.     After speaking to Bailey about the Hickory Ridge murder, Scheidler passed along what Bailey told him to Defendant Cummings of the State Police on January 11, 2007.

### B. State Police Strongarm Bailey Into Wearing a Wire

66.     On January 12, 2007, Defendants Cummings and Blankenship—who were then a Sergeant and Corporal with the State Police, respectively—spoke with Bailey.

67.     Bailey stated that two years prior, around March 2005, Dement had been drinking alcohol when he mentioned that he and three friends murdered a woman on Hickory Ridge.

68.     According to Bailey, Dement stated the four men picked up a girl and raped her on an abandoned farm before they "got scared" and killed her.

69.     Dement had also allegedly told Bailey that the victim was stung by bees, and that Dement himself had killed Ms. Crawford by kicking her in the head after he and the other men had tortured her by pulling out her fingernails, eyebrows, and pubic hair.

70.     In addition, Bailey told Cummings and Blankenship that, three to four months prior to their interview, he was spending time with Dement and Dement's then-girlfriend when Dement re-told the story a second time.

71.     This second time around, according to Bailey, Dement claimed he was only present for the murder, which was carried out by the three other men.

72.     Dement never mentioned the victim's name or the date of the killing.

73.     On information and belief, Cummings and Blankenship told Greg Bailey information known to the State Police about the cause of Ms. Crawford's death and/or the circumstances under which her body was discovered during their meeting on January 12, 2007.

74.     Cummings and Blankenship then asked Bailey to wear a wire to surreptitiously record his nephew while he attempted to extract a confession.

75.     When Bailey did not immediately agree to do so, Cummings and Blankenship no longer requested that Bailey wear a wire—they demanded it.

76.     Cummings and Blankenship threatened Bailey, telling him that, unless he agreed to wear a wire, Bailey would face five years' jail time for being an "accessory" to the murder.

77.     For the State Police, Bailey's statements offered an opportunity to remedy their failure to solve a disturbing cold case that had shaken the community.

78.     Fearing that Cummings and Blankenship would make good on their threats to send him to prison, Bailey agreed to wear a wire and speak with his nephew.

79.     Dement, who was then 26 years old, had by that point been diagnosed with bipolar disorder, antisocial personality disorder, depression, and anxiety.

80.     He also had a history of severe alcohol and drug abuse, including opiates, sedatives, cannabis, and hallucinogens.

81.     Dement's family, friends, and acquaintances knew him to be someone who lied, boasted, and exaggerated details about his life to make himself look tough.

82.     On information and belief, Dement received nonpublic information about the details of Ms. Crawford's death from two individuals before the State Police interrogated him: Bailey, who had been given that information by Cummings and Blankenship at their January 12 meeting, and Dement's brother David Denof, who had driven past the crime scene in August 2002 soon after the victim's body was discovered.

83.     Bailey recorded two conversations with Dement in January 2007.

84.     In the first conversation, on January 22, 2007, Dement named Justin Black and Plaintiffs Philip and Nathan Barnett as the other individuals involved in the Ms. Crawford's murder.

85.     During the conversation, Bailey encouraged Dement by telling him: "One of them boys is talking on you, Brian."

86.     In the second conversation, on January 28, 2007, Bailey spoke with Denof, Dement's brother, before approaching Dement.

87.     Denof suggested that Dement was using crystal methamphetamine: "You can see the veins going through his eyelids real bad, I mean it's just a glare in his eyes, you know what I mean?"

88.     Denof also shared with Bailey that he knew several supposed details concerning the crime scene, including that there was an insect's nest found near the victim's body, and that her nails, toenails, and pubic hairs had been pulled out, because he drove past the crime scene and saw the body being taken away.

89.     Later in the recording, Dement told Bailey he was "all fucked up" on drugs.

90.     When Bailey mentioned that Dement's brother was worried Dement may be using meth, Dement responded: "Naw, dude, I'm not on meth. I'm on something higher, dude."

91.     Bailey immediately provided the recordings to the State Police, who detained and interrogated Dement that same day.

### III. Defendants Forcibly Extract a Fabricated Narrative

#### A.  *A Coercive 9-Hour Interrogation Produces Three False and Inconsistent Confessions From Dement*

92.     On the evening of January 28, 2007, Defendants Losh and Parde—who were then a Trooper and Corporal with the State Police, respectively—came to Dement's home.

93.     As Dement had stated on the recording made earlier that day, he was highly intoxicated, as he was drinking heavily and had taken several Xanax.

94.     Upon hearing the police, Dement hid in a cubby hole, confused and afraid.

95.     After Losh and Parde announced their presence, Dement came out of hiding to discover one of the officers pointing a gun at him.

96.     Losh and Parde told Dement that they were there concerning a malicious wounding charge.

97.     Dement agreed to go to the police station.

98.     The officers placed him in handcuffs until they arrived at the station.

99.     Dement informed them that he was drunk and high on Xanax.

100.    Even before the officers began the interrogation, Dement was already exhausted from staying up late the previous night and using drugs that evening into the next day.

101.    Over the course of the next nine hours, Losh, Parde, and other troopers harassed Dement, threatened him, and fed him details about the murder of Deanna Crawford in order to coerce him into falsely confessing to the crime.

102.   The grueling, nine-hour interrogation exhausted and intimidated Dement, stripping him of his agency and his ability to think clearly.

103.   The officers threatened Dement by telling him that he would never see daylight again if he did not confess and plead guilty to the murder.

104.   They continuously badgered Dement to convince him to confess, cycling through a "good cop, bad cop" routine to wear him down.

105.   They fed Dement details about the murder by way of leading questions.

106.   They lied to Dement by telling him that Philip, Nathan, and Black had already confessed to the murder and implicated Dement.

107.   Ultimately, Defendants coerced three statements from Dement in the evening of January 28 and morning of January 29. Two of the statements were signed and one was audio recorded.

108.   Each statement was untrue.

109.   Dement had no first-hand knowledge of the details of Ms. Crawford's murder because he and the three people he implicated—the Barnett brothers and Black—were not involved in the murder.

110.   Dement's statements were based on details given to him by the Defendants, as well as by Denof and Bailey (by way of the Defendants).

111.   Dement's statements were wildly inconsistent, offering conflicting accounts of the events leading up to the murder and whether he participated in or even saw the murder occur.

112.   Dement's first statement, which was written in Losh's handwriting, was taken at approximately 8:22 p.m. on January 28, 2007, after he had been interrogated for approximately one-and-a-half hours.

113.    According to Dement's initial story:

    a.    He attended a party at Vetina Baylous's house "a few years ago."

    b.    At Black's suggestion, the four men left together to go for a ride with Ms. Crawford in a blue or black car.

    c.    Black parked the car and Philip suddenly punched Ms. Crawford in the head.

    d.    While Dement stayed in the car, the other men "dragged her away."

    e.    Dement purportedly escaped by the time the men later came back to the car; he ran to a grocery store on Route 10, where he called a cab to his Uncle Jimmy's house.

    f.    Black then supposedly drove 80 miles per hour along Hickory Ridge back to the party.

114.    Approximately two hours after Dement gave his first statement, Defendants subjected Dement to a polygraph examination.

115.    The results of that examination were inconclusive and were not provided to Dement during the interrogation.

116.    Dement's second statement was taken seven hours later, at 3:33 a.m. on January 29, and was also written in Losh's handwriting, but involved a wildly different narrative.

117.    In this version, Dement claimed:

    a.    Dement did not stay in the car, but jumped up with the others to participate in the assault.

    b.    Dement, not Philip, dragged Ms. Crawford down a hill, and Dement threw the first punch after Ms. Crawford began screaming.

    c.      Dement then hid behind some bushes while the others continued to attack Ms. Crawford.

    d.      After about ten to fifteen minutes, the other men drove off and he went to check on Ms. Crawford, whose face was swollen and body curled.

    e.      Dement checked her pulse and discovered that she was dead.

    f.      He walked along Route 10 to his Uncle Jimmy's house, which took several hours, as the house was 17 miles away.

118.    Dement's third statement, taken more than nine hours after Dement was detained, at 4:52 a.m. on January 29, also diverged from the first two statements.

119.    In this version, Philip punched Ms. Crawford and said "let's get this bitch" before Dement grabbed her by the throat.

120.    This time, Dement attested that he hid in the weeds while the other men killed the victim, then ran to his Uncle Jimmy's house, which took three hours.

121.    Dement's third statement was the only of the three to be audio recorded.

122.    The statement involves a series of extremely leading questions wherein Defendants Cummings and Parde provide details of their supposed theory of the crime.

123.    For example, when describing who was at the party at Vetina Baylous's home, Dement listed several people, including Philip, Nathan, and Black, before Cummings asked, "and you told us earlier that there was a girl there?"

124.    When discussing that Dement left to drive in a car with Philip, Nathan, and Black, Cummings asked a series of questions about which side of the road the car was pulled over onto before questioning, "And what was over there some type of landmark or something?"

125.    Following questions about the attack, Cummings probed, "Did they leave or . . . ?" and stated, "I guess that was when you went over to check on her?"

126.    When asked about the victim, Dement said: "I can't remember the name you all told me."

127.    In total, the interrogation lasted approximately nine to ten hours overnight, beginning around 7:00 p.m.

128.    Prohibited from sleeping or resting, and coming down from being extremely high, Dement was increasingly fatigued.

129.    This exhaustion depleted his ability to control himself and increased his susceptibility to the influence of the police.

130.    Following the interrogation, Dement told his brother that he was "so messed up" during the interrogation that he didn't even remember speaking to the police.

131.    Having fed Dement details concerning the crime and successfully coerced him to falsely confess, Defendants turned their attention to coercing another false confession, this time from Black.

### B.  *Defendants Feed Black Details of the Crime To Coerce Another False Confession*

132.    Black, who was then 23 years old, was called in for questioning by State Troopers on January 29, 2007. He arrived at the police station around 7:00 p.m.

133.    For the first 20-25 minutes of his interrogation, Defendants Cummings, Losh, Pack, and Parde asked Black questions related to Ms. Crawford's murder.

134.    Black initially told them he did not know anything about Ms. Crawford or her murder.

135.    Unsatisfied by Black's responses, Defendants asked Black if he would submit to a polygraph test, and Black consented.

136.    Black was then brought to a room with Defendant Blankenship, a State Police Corporal, who sat and watched television while other officers entered the room and engaged in improperly coercive tactics to elicit a false confession.

137.    Defendants Cummings, Losh, and Parde accused Black of participating in the crime and told him that Dement had already confessed and implicated him.

138.    They began to feed Black vivid details of the crime taken from the autopsy report, as they had done to Dement the previous day, telling Black that Ms. Crawford died by manual strangulation, that a bone in her neck was broken, she was drugged, and insects had been found on her body.

139.    They also shared details they gathered from Dement's false confession, including that the crime had allegedly occurred after a party at Vetina Baylous's house, and the seats in which the group had supposedly sat in the car after leaving the party.

140.    After administering the polygraph test two hours later, around 10:30 p.m., Defendant Pack told Black that he had failed and berated him for being a liar.

141.    She ridiculed Black and peppered him with questions as he became terrified and began to shake and cry, pleading that he wanted to go home.

142.    Defendant Pack threatened Black using his parole status, telling him that his parole would be revoked if he did not confess, and asking him if he wanted to lose everything that he had worked so hard to achieve.

143.    Terrified at the prospect of losing his parole, Black broke down and asked Pack what she wanted to hear.

144.    At approximately 2:00 a.m. on January 30, 2007, Black gave a statement using the details the police gave him during the interrogation.

145.    Although no portion of the interrogation had been recorded to that point, Defendants began recording Black after he followed their fabricated narrative.

146.    The recording includes Defendants asking a series of leading questions.

147.    For example, when Black described that he and his friends were at a party "being regular teenagers," Defendant Cummings asked, "Okay and on one occasion you end up leaving?"

148.    When Black answered, "Yes," Cummings continued, "In a vehicle?"

149.    When Black identified the other individuals in the car as Philip, Nathan, and Dement, Cummings responded, "Okay, and there was a girl in the car also?"

150.    Black's statement is also inconsistent with Dement's.

151.    For example, Black stated that Nathan sat next to him in the front seat, whereas Dement had stated that Ms. Crawford rode in the front.

152.    Black also stated that he had only driven to and from the scene on the night of Ms. Crawford's death, and not that he had assaulted her, as Dement had claimed the previous day.

153.    Black was also positive that the party occurred on his friend's birthday, which was July 28, and was several days before Ms. Crawford was last seen alive, as shown in the surveillance footage Defendants possessed.

154.    At 2:40 a.m. on January 30, Black signed a statement confessing to the crime handwritten by Defendant Parde.

155.    Defendants then permitted Black to leave.

### C.  *Philip and Nathan Assert Their Innocence*

156. Defendant Losh interrogated Philip about Ms. Crawford's murder on January 29, 2007, at approximately 10:00 p.m. Defendant Cummings was also present.

157. Philip asserted truthfully that he had never met Ms. Crawford and had no knowledge of the crime.

158. Losh placed Philip in handcuffs for the entirety of his interrogation, which lasted overnight.

159. For hours, Losh and Cummings berated Philip with questions about his alleged involvement in the murder and became incensed when Philip refused to fold to pressure.

160. When Philip asked for a lawyer, he was told, "you're not going to need a lawyer where you're going."

161. Despite the pressure, Philip remained steadfast in his denial of any involvement with the murder.

162. Nathan was interrogated by Defendant Parde on January 29, 2007, at approximately 10:00 p.m. Defendants Cummings and Losh and another unknown member of the State Police were also present periodically.

163. Nathan, too, maintained his innocence.

164. Defendants Parde, Cummings, and Losh became enraged when another Barnett brother refused to bend to their will.

165. As Nathan denied Defendants' fabricated narrative concerning the events surrounding Ms. Crawford's murder, the troopers resorted to physical violence.

166. One of the officers grabbed and manhandled Nathan by his ears and throat, and Losh kicked him in the chest.

167. Nonetheless, Nathan resolutely denied any involvement in the crime.

18

### D. Dement and Black Recant Their False Confessions

168.   Dement began to recant his coerced statements almost immediately after his January 2007 interrogation.

169.   On April 11, 2007, Dement submitted to a psychological assessment in which he denied any involvement in the murder and explained that he suffered from long-standing problems with drug abuse, depression, and anxiety. The examiner noted Dement's bipolar and attention deficit disorder diagnoses.

170.   Dement also attempted to recant his confession while his attorneys were negotiating a plea deal with Prosecuting Attorney Chiles in the months between April and October 2007.

171.   Dement told Chiles the statements were false, and that he wanted to take back his "confession."

172.   In response, Chiles threatened Dement with a longer sentence, stating that Dement would be convicted under any circumstances, and moving forward with the plea deal was the only way to avoid additional jail time.

173.   Dement accepted a plea deal on October 23, 2007.

174.   In exchange for Dement's agreement to plead guilty to second-degree murder and an unrelated malicious wounding charge, he received a recommended sentence of 20 to 24 years.

175.   As part of the deal, Dement also agreed to testify against Philip, Nathan, and Black at their trials.

176.   Two days after Dement took the plea deal, he acknowledged to defense investigator Greg Cook that his statements to police were fabricated.

177.   In a recorded statement, Dement maintained: "We are all innocent."

178.    Dement explained that Defendants "came to [his] house without [his] permission, put handcuffs on [him], put guns to [his] head."

179.    He added that, at the police station, Defendants interrogated him "when [he] was intoxicated and messed up" and "got [him] thinking that all this stuff was true."

180.    Dement told Cook that he had tried to "go against [his] statement," but was prohibited from doing so by his lawyers and the judge.

181.    Like Dement, Black also moved quickly to recant the statement Defendants coercively extracted from him.

182.    Black disavowed the false confession at the police station two weeks after the interrogation.

183.    Black explained that his statement implicating himself, Philip, Nathan, and Dement had been fabricated.

184.    He reiterated what he had told several of the Defendants when he was first interrogated: he had no first-hand knowledge of Ms. Crawford or her murder.

185.    In response, Cummings attempted to coerce Black into fabricating additional allegations against Philip and Nathan, telling him that he would be given immunity from prosecution if he implicated Philip and Nathan in the murder.

186.    Black refused and signed a written recantation.

### E.  Philip and Nathan Are Indicted and Arrested

187.    In the months following the Defendants' interrogation of Philip and Nathan, the forensic laboratory ran DNA tests on samples obtained from the crime scene, including from the beer cans, tobacco cans, and cigarettes found near Ms. Crawford's body.

188.    The DNA results conclusively excluded Philip and Nathan as contributors.

189. Subsequent tests also excluded Black and Dement.

190. Cummings was notified that the DNA profile from the crime scene did not match that of Philip, Nathan, Black, or Dement.

191. No physical evidence from the crime scene ever linked any of the men to the murder.

192. Nevertheless, based purely on the coerced, unreliable, and inconsistent statements from Dement and Black, Defendants sought to indict Philip and Nathan for the crime.

193. In doing so, Defendants failed to provide the grand jury with exculpatory evidence concerning the coercive methods used to interrogate Black and Dement, including the threats made against them, the information and lies fed to them, and the physical state that Black and Dement were in when they gave their coerced confessions.

194. In May 2007, a grand jury indicted Nathan, Philip, Black, and Dement for "jointly" murdering Ms. Crawford some time between August 4 and August 8, 2002.

195. Philip and Nathan were arrested on May 15, 2007, and held in Western Regional Jail for 15 days.

196. At their arraignment on May 31, 2007, Philip and Nathan were placed on home confinement.

197. Black and Dement were also arrested.

198. Black was tried first, beginning in February 2008, resulting in a mistrial.

199. During Black's second trial, which began in April 2008, Black introduced the two recanting statements from Dement obtained after his October 2007 guilty plea.

200. Nevertheless, Black was convicted of second-degree murder on July 2, 2008.

## IV. Philip and Nathan Are Wrongfully Convicted As the Prosecution Withholds Material Exculpatory Evidence

### A. *"No Known Exculpatory Evidence"*

201.  Philip and Nathan's murder case was personally handled by Cabell County Prosecuting Attorney Christopher G. Chiles.

202.  Chiles was assisted in certain pretrial matters by Assistant Prosecuting Attorney Jara L. Howard, but he tried the case himself.

203.  As Prosecuting Attorney, Chiles exercised final municipal policymaking authority for Cabell County over all prosecutorial matters under West Virginia Code § 7-4-1.

204.  Chiles had the ultimate authority to establish policies and procedures on behalf of Cabell County with respect to the conduct of criminal discovery; the disclosure of exculpatory evidence and impeachment evidence; and ensuring that criminal defendants prosecuted by the Prosecuting Attorney's Office received fair trials.

205.  On information and belief, Chiles had the ultimate authority to hire and fire attorneys in the Prosecuting Attorney's Office on behalf of Cabell County.

206.  On information and belief, Chiles had the ultimate authority to train, discipline, and supervise attorneys in the Prosecuting Attorney's Office on behalf of Cabell County to ensure that they complied with their constitutional and statutory obligations.

207.  On June 13, 2007, Howard responded in writing to discovery requests served by counsel for Nathan and Philip.

208.  In response to a demand for exculpatory evidence, Howard wrote: "There is no known exculpatory evidence."

209.   This representation was false.

210.   In fact, the Cabell County Prosecuting Attorney's Office possessed numerous items of exculpatory evidence and information, including but not limited to:

     a.    The fact that William Scott Harbour had numerous open criminal cases in Cabell County and was offered favorable consideration on the morning of his testimony against Nathan and Philip, as discussed in detail below;

     b.    The fact that Bailey was a police informant; and

     c.    A laboratory finding that tire marks at the murder scene did not match the tires found on the vehicle in which Nathan, Philip, Dement, and Black supposedly drove the victim to the crime scene.

211.   Chiles and Howard served several supplemental pretrial responses to the discovery requests served by Nathan and Philip's counsel.

212.   Neither in his own responses on behalf of the State nor in his capacity as Howard's supervisor did Chiles correct the misrepresentation that no exculpatory evidence existed.

### B. A Baseless Verdict

213.   Philip and Nathan were confined to their home for 15 months before their joint trial began on August 25, 2008.

214.   The State's extremely weak case centered primarily on a false and coerced confession from Dement.

215.   No forensic evidence connected Philip and Nathan to the crime.

216.   Indeed, all available physical evidence indicated that Philip and Nathan were *not* involved in the crime.

217.    No eyewitness placed Philip or Nathan at the location where Ms. Crawford's body was discovered, aside from Dement.

218.    The prosecution theorized that the murder occurred during a party at Vetina Baylous's residence in August 2002, during which Nathan, Philip, Black, and Dement left the party, drove up Hickory Ridge with the victim, and murdered her.

219.    The prosecution called numerous witnesses to try to demonstrate that Philip, Nathan, Black, and Dement attended a party at Vetina Baylous's home in early August 2002.

220.    Those witnesses could not agree on when the party happened, who attended it, whether Nathan and Philip ever left, and if so with whom or in what kind of vehicle.

221.    For example, some said the party was in July (before Ms. Crawford was last seen alive); some said it was after.

222.    Multiple prosecution witnesses testified that Dement was not at the party, when he claimed he was.

223.    Most of the prosecution's own witnesses testified that the victim did not even attend the party.

224.    The only witness other than Dement to place the victim at the party was Harbour.

225.    At the time of his testimony in August 2008, Harbour had three open criminal cases in Cabell County.

226.    Chiles had represented to defense counsel that he would not call Harbour as a witness at Philip and Nathan's trial.

227.    Yet, the night before Harbour's testimony, Chiles informed defense counsel that he did intend to call Harbour after all, purportedly on the basis of statements made by a relative of Harbour's during a local news broadcast.

228.    Harbour met with Chiles on the morning of Harbour's testimony.

229.    Chiles and Harbour discussed the fact that Harbour had open cases.

230.    Chiles told Harbour, in sum and substance, that Harbour should contact him if he needed assistance in the future.

231.    Based upon Chiles's statements, Harbour understood his testimony against Nathan and Philip to be a "get out of jail free card."

232.    Harbour testified at trial that he saw a woman wearing "leopard print pants" at a party at Vetina Baylous's home that Philip and Nathan attended.

233.    Leopard-print pants had been found next to Ms. Crawford's body, and evidence established that her friends had purchased them for her shortly before she died.

234.    In his direct testimony, Chiles took Harbour through a series of leading questions.

235.    For example, after Harbour identified a party at Vetina Baylous's house in the late summer of 2002, Chiles asked, "Do you remember seeing someone who stuck out in your mind because of the way they were dressed?"

236.    Harbour's demeanor abruptly changed each time he was asked about the woman with the leopard print pants; he suddenly became unable to answer the prosecutor's questions verbally, and instead resorted to nodding his head up or down.

237.    When interviewed by police approximately a year earlier, Harbour had never mentioned the "leopard print pants" or otherwise identified the victim as having attended the party.

238.    Nonetheless, Chiles relied heavily upon Harbour's testimony about the woman in leopard-print pants in his closing argument to the jury.

239.    Chiles never disclosed to Nathan or Philip's criminal defense counsel that Harbour had multiple open criminal cases at the time, had discussed them with the prosecution just before testifying, or had been offered future consideration.

240.    All of Harbour's open cases were dismissed within three months of his testimony against Nathan and Philip.

241.    When Dement testified at the joint trial, he disavowed his prior recantations.

242.    His testimony once again differed both from the evidence gathered at the scene of the crime and from his previous statements, which were themselves inconsistent.

243.    For example, Dement testified that he had dragged Ms. Crawford out of the car, and that the other boys had left him on Hickory Ridge, unlike his first statement.

244.    He also testified that when he went to check on Ms. Crawford after she had been killed, she was "fully clothed," but the victim was found partially nude.

245.    Philip and Nathan were convicted of second-degree murder on August 27, 2008, a mere two days after their trial began. Philip was sentenced to 40 years in prison and Nathan to 36.

### C. *Nathan and Philip Take* Kennedy *Pleas to Avoid Another Miscarriage of Justice*

246.    In 2010, the West Virginia Supreme Court of Appeals vacated Nathan and Philip's convictions, holding that "the lower court abused its discretion by excluding evidence that Dement had told a defense investigator that his confession was false."

247.    Having already been convicted in an extremely weak case, Philip and Nathan were fearful of what would happen if they went to trial again.

248.    Desperate to avoid a retrial and imprisonment for the rest of their lives, they made the agonizing decision to accept *Kennedy* pleas to voluntary manslaughter on January 18, 2011, allowing them to maintain their innocence while nonetheless being convicted.

249.    Philip and Nathan were each sentenced to fifteen years in prison.

250.    Philip also took a *Kennedy* plea to malicious wounding in connection with the incident, resulting in an additional consecutive sentence of two to ten years.

### D. *New Evidence Proves the Barnett Brothers' Innocence*

251.    Justin Black was appointed post-conviction counsel and filed a second motion for post-conviction DNA testing in November 2015.

252.    The motion sought testing for evidence collected from the crime scene, including cigarette butts and Ms. Crawford's leopard print pants, as well as a retest of the sexual assault kit.

253.    By the time of Black's November 2015 motion, new technology enabled DNA testing of samples that were previously unusable.

254.    The State opposed the motion.

255.    Philip and Nathan joined the motion for post-conviction DNA testing.

256.    The Circuit Court granted the motion for post-conviction DNA testing in September 2016.

257.    In August 2017, Philip, Nathan, Black, and Dement were all excluded as matches for the DNA profile obtained from semen that was detected on the interior crotch of Ms. Crawford's pants.

258.    Additional testing in October 2017 revealed that DNA obtained from the semen matched with DNA from cigarette butts found near Ms. Crawford's body.

259.    The DNA profile from the evidence was run through the FBI's Combined DNA Index System ("CODIS"), revealing a match to convicted sex offender Timothy Smith, who was then incarcerated in Ohio for a sex-related conviction.

260.    At the time of the murder, Smith lived in South Point, Ohio, just across the river from Huntington, West Virginia.

261.    That summer, Smith's ex-wife saw him come home with blood on his hands, several days before coverage of the Crawford homicide appeared on television.

262.    Upon learning the results of the new DNA testing, Defendants Losh and Parde visited Smith in prison on February 2, 2018, to warn him that lawyers might visit him regarding the matter.

263.    They told Smith that four men had already been convicted of the crime several years prior, that they believed they "had the right people," and that he should keep his mouth shut.

### E. *Philip and Nathan Are Exonerated and the Charges Dismissed*

264.    Philip and Nathan filed petitions to overturn their convictions on February 26, 2018.

265.    At that time, Nathan had been released from prison since July 10, 2016.

28

266.    Philip was released on bail on August 9, 2018, while his habeas petition based on the new exculpatory evidence was pending.

267.    In May 2019, the Circuit Court vacated Philip and Nathan's *Kennedy* pleas on the basis of the exonerating DNA test and granted them a new trial.

268.    More than two years later, on October 5, 2021, the State finally dismissed all charges against Philip, Nathan, and Black.

### V. Brothers Robbed of 18 Years

269.    Because of Defendants' unlawful actions, Philip and Nathan lost 18 years of their lives to wrongful incarceration for a crime of which they were innocent.

270.    Philip was incarcerated for more than a decade; Nathan for eight years.

271.    Philip and Nathan suffered, and continue to suffer, severe emotional distress as a result of being wrongfully accused of, convicted of, and incarcerated for the murder of Ms. Crawford.

272.    Toward the beginning of their incarceration, when Nathan and Philip were both held at Mount Olive Correctional Complex, each brother was falsely labeled a "sex offender" based on their pre-sentence reports, even though the State's own theory was that the murder of Ms. Crawford had no sexual motive.

273.    Aware that convicted sex offenders are more likely to be targeted for violence by other incarcerated individuals, Nathan and Philip were terrified that this false "status" would be discovered by other prisoners.

274.    They lived in fear of being attacked based on these erroneous labels for several weeks before they were removed.

275.    Philip and Nathan also saw their physical health deteriorate during their time in prison, exacerbated by the denial of medical and dental care that they endured.

276.   Philip began to suffer from debilitating panic attacks that caused him shortness of breath and pounding in his chest.

277.   The panic attacks made Philip afraid that he was suffering a heart attack.

278.   After several of these episodes, prison staff at Stevens Correctional Center finally took him to an outside doctor, who performed tests and diagnosed him with hypothyroidism.

279.   Nathan suffered from extreme tooth pain after experiencing a wisdom tooth abscess for over one month.

280.   The abscess resulted in severe, persistent pain that radiated to his jaw, sensitivity to temperatures in food, and swelling around the tooth and jaw.

281.   Although Nathan repeatedly attempted to get help for the excruciating symptoms, he was ignored by prison staff for weeks.

282.   Philip and Nathan continue to suffer from the effects of their incarceration.

283.   Both men experience disturbing nightmares that include scenes from their time in prison.

284.   Nathan experiences these anxiety dreams multiple nights per week.

285.   The nightmares cause Nathan to wake up physically kicking and screaming out of fear.

286.   Philip has four children who are currently between the ages of 11 and 18.

287.   Philip's wrongful imprisonment at the hands of Defendants deprived him of the opportunity to witness and nurture the growth of his children.

288.   Philip continues to work to rebuild the relationships with his children that have been strained by his years of absence.

30

289.    Philip and Nathan were also deprived of income and the opportunity to develop skills through gainful employment.

290.    Philip and Nathan have sustained reputational damage as a result of the ordeal of being falsely accused and convicted of a murder they did not commit.

291.    Although nothing can undo the lasting psychological consequences of so many years of unjust incarceration, they now seek to rebuild their lives in peace, and demand justice for all that was taken from them.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fabrication of Evidence in Violation of the Right to a Fair Trial
(Against the Individual Defendants)

292.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

293.    At all relevant times, the Individual Defendants acted under color of law in investigating Plaintiffs for the murder of Deanna Crawford.

294.    The Individual Defendants fabricated evidence against Plaintiffs and/or failed to intervene to prevent the fabrication of evidence against Plaintiffs despite having knowledge of the fabrication and a reasonable opportunity to intervene.

295.    The fabricated evidence includes but is not limited to the fabricated statements the Individual Defendants coerced from Brian Dement and Justin Black.

296.    This evidence was of the kind that was likely to influence the jury's verdict finding Plaintiffs guilty.

297.    The Individual Defendants forwarded this fabricated evidence to prosecutors, and Plaintiffs suffered a deprivation of liberty as a result.

298.    Plaintiffs were wrongfully convicted and incarcerated as a result.

299.    The Individual Defendants' actions were knowing, willful, wanton, and reckless.

300.    The Individual Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Malicious Prosecution in Violation of the Fourth Amendment
(Against the Individual Defendants)

301.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

302.    The Individual Defendants initiated criminal proceedings against Plaintiffs by generating evidence against them and providing it to prosecutors.

303.    The proceedings terminated in Plaintiffs' favor when all charges against them were dismissed in light of exonerating DNA evidence.

304.    There was no probable cause for the criminal proceedings against Plaintiffs, which were based upon fabricated and patently unreliable evidence.

305.    The fabricated evidence and coerced confessions of Dement and Black were material to the grand jury's finding of probable cause against Philip and Nathan.

306.    As demonstrated by their gross deviations from acceptable police procedures and intentional fabrication of evidence, Defendants acted with malice in pursuing criminal proceedings against Plaintiff.

307.    To the extent they did not initiate the criminal proceedings themselves, the Individual Defendants failed to intervene to prevent the baseless prosecution of Plaintiffs without probable cause and with malice, despite having actual knowledge and a reasonable opportunity to do so.

308.    Plaintiffs were wrongfully convicted and incarcerated as a result.

309.   The Individual Defendants' actions were knowing, willful, wanton, and reckless.

310.   The Individual Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Suppression of *Brady / Giglio* Material – Fourteenth Amendment
(Against the Individual Defendants)

311.   Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

312.   Exculpatory and impeachment material within the possession and/or knowledge of the Individual Defendants was not disclosed to the Cabell County Prosecuting Attorney's Office in time for its effective use at Plaintiffs' criminal trial.

313.   Such material included, but was not limited to:

    a.   The coercive nature of the Individual Defendants' interrogations of Brian Dement and Justin Black;

    b.   The threats that Defendants Cummings and Blankenship used to persuade Greg Bailey to wear a wire and record his conversations with Brian Dement.

314.   This evidence and information was favorable to Plaintiffs, and was material to the outcome of Plaintiffs' criminal case, in that its disclosure would have led to a reasonable probability of a different outcome.

315.   The Individual Defendants suppressed the evidence in bad faith in that they intentionally withheld the evidence for the purpose of depriving Plaintiffs of the use of the evidence at trial.

316.    As a result of the Individual Defendants' suppression of material exculpatory or impeachment evidence and/or failure to intervene to correct the suppression of material exculpatory or impeachment evidence, Plaintiffs suffered the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
Malicious Prosecution Under West Virginia Common Law
(Against Defendants Cummings and Parde)

317.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

318.    Defendants initiated criminal proceedings against Plaintiffs by generating evidence against them and providing it to prosecutors.

319.    The proceedings terminated in Plaintiffs' favor when all charges against them were dismissed.

320.    There was no probable cause for the criminal proceedings against Plaintiffs, which were based almost entirely on fabricated and patently unreliable evidence.

321.    The fabricated evidence and coerced confessions of Dement and Black were material to the grand jury's finding of probable cause against Philip and Nathan.

322.    As demonstrated by their gross deviations from acceptable police procedures, suppression of exculpatory material, and intentional fabrication of evidence, Defendants acted with malice in pursuing criminal proceedings against Plaintiff.

323.    Plaintiffs were wrongfully convicted and incarcerated as a result.

324.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiffs' rights,

privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiffs.

325.    Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Negligence
(Against the Individual Defendants)

326.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

327.    The Individual Defendants owed Plaintiffs a duty to exercise reasonable care in the investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence and pursuing criminal prosecutions without sufficient basis.

328.    The Individual Defendants breached these duties by their conduct set forth above.

329.    The negligent acts and omissions of the Individual Defendants proximately caused the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress
(Against the Individual Defendants)

330.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

331.    In fabricating evidence, coercing false statements against Plaintiffs from Brian Dement and Justin Black, and providing that information to prosecutors while withholding exculpatory evidence, the Individual Defendants acted intentionally or

recklessly to Plaintiffs' severe emotional distress, which was certain to result from their conduct.

332.    Such conduct was a gross deviation from acceptable police procedures, and so extreme and outrageous as to exceed the bounds of decency.

333.    The Individual Defendants' actions, which resulted in Plaintiffs' incarceration for 18 years, collectively, was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

334.    Plaintiffs suffered severe and extreme emotional distress which was reasonable and foreseeable in light of the conduct of the Individual Defendants.

335.    The Individual Defendants' wrongdoing proximately caused the damages hereinbefore alleged.

### SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Suppression of *Brady / Giglio* Material – Fourteenth Amendment
(Against Defendant Cabell County Commission)

336.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

337.    Exculpatory and impeachment material within the possession and/or knowledge of the Cabell County Prosecuting Attorney's Office was not disclosed to Plaintiffs in time for its effective use at their criminal trial.

338.    Such material included, but was not limited to:

  c.    The fact that William Scott Harbour had multiple open criminal cases and was offered favorable consideration prior to testifying;

  d.    The fact that Greg Bailey was a police informant;

  e.    The laboratory finding that the tire marks at the murder scene did not match the tires recovered from Tara Gillespie's vehicle.

339. This evidence and information was material to the outcome of Plaintiffs' criminal case, in that its disclosure would have led to a reasonable probability of a different outcome.

340. Chiles, acting in his capacity as final municipal policymaker for Cabell County with respect to prosecutorial matters, made a deliberate choice not to disclose this information in bad faith and/or with deliberate indifference to the known risk that it would violate Nathan and Philip Barnett's constitutional rights.

341. In addition or in the alternative, Chiles, acting in his capacity as final municipal policymaker for Cabell County in supervising and training attorneys in the Prosecuting Attorney's Office, and acting in bad faith and/or with deliberate indifference to the known risk that it would violate Nathan and Philip Barnett's constitutional rights, chose not to correct his subordinate's misrepresentation that no exculpatory evidence existed and/or their failure to disclose such evidence.

342. As a result of Chiles's suppression of material exculpatory or impeachment evidence and/or failure to intervene to correct the suppression of material exculpatory or impeachment evidence, in his capacity as final municipal policymaker for Cabell County, Plaintiffs suffered the damages hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief jointly and severally against Defendants:

1.     Compensatory damages in an amount to be determined at trial;

2.     Punitive damages against the Individual Defendants in an amount to be determined at trial;

3.      Pre- and post-judgment interest to the fullest extent permitted by law;

4.      Reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.      Such other further relief as the Court may deem just and proper.

Dated:      April 26, 2022

KAUFMAN LIEB LEBOWITZ & FRICK LLP

Douglas E. Lieb*
Alison Frick*
Alyssa Isidoridy*
18 East 48th Street, Suite 802
New York, New York 10017
(212) 660-2332
dlieb@kllf-law.com
africk@kllf-law.com
aisidoridy@kllf-law.com

* *Application for* pro hac vice *admission forthcoming*

HISSAM FORMAN DONOVAN RITCHIE PLLC

*/s/ Skyler A. Matthews*
Ryan McCune Donovan (WV Bar #11660)
Skyler A. Matthews (WV Bar #13532)
707 Virginia Street East, Suite 260
Charleston, West Virginia 25301
(681) 265-3802
rdonovan@hfdrlaw.com
smatthews@hfdrlaw.com