IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

NATHAN BARNETT and
PHILIP BARNETT,

                Plaintiffs,

v.                                       CIVIL ACTION NO.  3:22-0203

CABELL COUNTY COMMISSION; and
ANTHONY CUMMINGS,
GREG LOSH,
KIMBERLY PACK,
MIKE PARDE, and
EDDIE BLANKENSHIP,
in their official capacities,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

    Pending before the Court is Defendant Cabell County Commission's Motion to Dismiss Complaint, or, in the Alternative, for Summary Judgment. ECF No. 29. For the following reasons, the Motion to Dismiss is **GRANTED**.

**I. BACKGROUND**

    The claims brought by Plaintiffs Nathan and Philip Barnett stem from their conviction and eventual exoneration for the murder of Deanna Crawford. *See* Compl., ECF No. 1. On August 8, 2002, Ms. Crawford's body was found in Cabell County. *Id*. ¶¶ 39-40, 43. Approximately five years after the initial investigation into her murder, in January 2007, criminal informant Gregory Alan Bailey provided information to Cabell County Deputy Sheriff Jim Schiedler implicating Mr.

Bailey's nephew, Brian Dement, and three friends in the murder. *Id*. ¶¶ 58-59, 61-62. Deputy Schiedler allegedly "passed along" this information to Defendant Anthony Cummings of the West Virginia State Police on January 11, 2007. *Id*. ¶ 65. In response, Defendant Officers Cummings and Eddie Blankenship interviewed Mr. Bailey the following day. *Id*. ¶ 66. The Complaint alleges that during this encounter Mr. Bailey informed these officers that Mr. Dement repeatedly confessed to killing Ms. Crawford with friends, that Defendants Cummings and Blankenship provided Mr. Bailey with non-public information concerning the murder, and that Defendants Cummings and Blankenship coerced Mr. Bailey into wearing a wire under threats of imprisonment. *Id*. ¶¶ 68-78.

Mr. Bailey proceeded to record two conversations with Mr. Dement concerning the murder. *Id*. ¶ 83. In one of these conversations, Mr. Dement named Justin Black alongside Plaintiffs Nathan and Philip Barnett as the other individuals involved in Ms. Crawford's murder. *Id*. ¶ 84. Upon obtaining these recordings, the State Police first interrogated Mr. Dement, then Mr. Black, and finally the Barnett brothers. *Id*. ¶¶ 91, 131, 156. While Mr. Dement and Mr. Black both provided confessions (which they subsequently recanted), the Barnetts steadfastly maintained their innocence. *Id*. ¶¶ 131, 144, 156-75, 182-83. Nonetheless, in May 2007, a grand jury indicted Philip and Nathan Barnett for the murder of Ms. Crawford. *Id*. ¶ 194.

It appears undisputed that no physical evidence ever linked the Barnetts to the murder. *Id*. ¶ 191. In fact, the Complaint asserts that DNA evidence taken from cigarette butts found at the scene of the crime "conclusively excluded" all four men. *Id*. ¶¶ 188-89. The subsequent trials of Mr. Black and the Barnetts were therefore grounded almost entirely in the confessions made by Mr. Dement and Mr. Black. *Id*. ¶¶ 192, 194, 200, 214-17. At the Barnetts trial, Mr. Dement reportedly disavowed his prior recantations, and provided a new, conflicting narrative of the events

of Ms. Crawford's murder. *Id*. ¶¶ 241-44. The Barnetts' case was handled by then-Prosecuting Attorney Christopher G. Chiles[1] and then-Assisting Prosecuting Attorney Jara L. Howard[2] of the Cabell County Prosecuting Attorney's Office ("CCPA") who allegedly falsely informed the Barnetts that "there is no known exculpatory evidence" when prompted in June 2007. *Id*. ¶¶ 201-02, 208-10. The allegedly suppressed information at this time included: (1) that government witness William Scott Harbour "had numerous open cases in Cabell County and was offered favorable consideration on the morning of his testimony," (2) the fact that Mr. Bailey was a police informant, and (3) a laboratory result indicating that tire marks found at the murder scene did not match the Barnetts' alleged vehicle. *Id*. ¶ 210. The Complaint further asserts that Mr. Chiles did not correct Ms. Howard's misrepresentation concerning this information. *Id*. ¶ 212.

The government's case at trial alleged that Mr. Dement, Mr. Black, and the Barnetts left a party with Ms. Crawford prior to her murder. *Id*. ¶ 218. However, numerous witnesses called by the prosecution provided conflicting testimony at trial concerning this party, especially as to the date and guests in attendance. *Id*. ¶¶ 221-24. Plaintiffs assert that only Mr. Harbour testified that Ms. Crawford was present at the party, and that he only did so because he "understood his testimony against Nathan and Philip [Barnett] to be a 'get out of jail free card'" as to pending charges against him. *Id*. ¶¶ 230-36. In essence, the Complaint alleges that Mr. Chiles informed Mr. Harbour that charges against him would be dropped in exchange for his testimony against the Barnetts. *Id*. ¶¶ 228-31. Further, Plaintiffs imply that Mr. Harbour's testimony was altered to

---

[1] The Honorable Christopher G. Chiles is now a judge on the Sixth Judicial Circuit Court of West Virginia.
[2] The Honorable Jara L. Howard is now a judge on the Sixth Family Court Circuit of West Virginia.

include a recollection of Ms. Crawford's presence at the party only after speaking with Mr. Chiles. *Id*. ¶ 237. Post-trial, Mr. Harbour's open cases were dismissed. *Id*. ¶ 240.

Based on the above, the Barnetts were convicted of second-degree murder on August 27, 2008; Philip was sentenced to 40 years imprisonment and Nathan was sentenced to 36 years imprisonment. *Id*. ¶ 245. However, in 2010, the Supreme Court of Appeals of West Virginia vacated their convictions, based on the lower court's abuse of discretion in excluding evidence concerning the prior inconsistent statements of Mr. Dement. *Id*. ¶ 246; *see State v. Barnett*, 701 S.E.2d 460 (2010). Making the strategic decision to avoid a retrial, the Barnetts accepted *Kennedy* pleas[3] to voluntary manslaughter on January 18, 2011. Compl. ¶ 248. Each man was sentenced to 15 years imprisonment. *Id*. ¶ 249. Philip Barnett took a second *Kennedy* plea to malicious wounding, resulting in an additional consecutive sentence of two to ten years. *Id*. ¶ 250.

The prosecution of the Barnetts has since been revealed as a miscarriage of justice. In August 2017, post-conviction DNA testing utilizing new technology definitively excluded Mr. Dement, Mr. Black, and the Barnetts from the DNA profile obtained from newly discovered semen found on Ms. Crawford's pants. *Id*. ¶¶ 251-57. However, the semen DNA profile matched that of the DNA initially found on the cigarette butts. *Id*. ¶ 258. The DNA profile was run through the Federal Bureau of Investigation's Combined DNA Index System, revealing a match to convicted sex offender Timothy Smith, who was incarcerated in Ohio. *Id*. ¶ 259. At the time of Ms. Crawford's murder, Mr. Smith had been living in South Point, Ohio; furthermore, his ex-wife allegedly saw him covered in blood in the days leading up to the discovery of Ms. Crawford's body. *Id*. ¶¶ 260-61.

---

[3] In West Virginia, a *Kennedy* plea allows a defendant to accept a plea deal while maintaining their innocence. *See Kennedy v. Frazier*, 357 S.E.2d 43 (W. Va. 1987).

On February 26, 2018, the Barnetts filed petitions to overturn their convictions. *Id*. ¶ 264. In May 2019, the Circuit Court vacated their *Kennedy* pleas based on the exonerating DNA evidence and granted them a new trial. *Id*. ¶ 267. On October 5, 2021, the State dismissed all charges against the Barnetts. *Id*. ¶ 268.

On April 26, 2022, Philip and Nathan Barnett filed suit in this Court. The Barnetts' Complaint brings seven causes of action against five officers involved in their incarceration and the Cabell County Commission ("CCC"). *Id*. at 31-37. Only one count is brought against CCC: Count VII – Suppression of *Brady*/*Giglio* Material. On August 4, 2022, CCC filed its Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment. Def.'s Mot. to Dismiss, ECF No. 29. The parties timely responded, ECF No. 37, and replied, ECF No. 39. The Court also granted Plaintiffs a surreply. ECF No. 59. The Court heard oral argument on March 15, 2023. ECF No. 117. Accordingly, the matter is now ripe for adjudication.

## II. LEGAL STANDARD

### A. Motion to Dismiss Standard Under Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the facts alleged in the complaint need not be probable, the statement must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In considering the plausibility of a plaintiff's claim, the Court accepts all factual allegations in the complaint as true. *Id*. Still, "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Id*. (quoting, in part, Fed. R. Civ. P. 8(a)(2)). Nonetheless, a plaintiff need not show that success is probable to withstand a motion to dismiss. *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

### B. Motion for Summary Judgment Under Rule 56

In the alternative, CCC has asked this Court to consider an attached exhibit and grant it summary judgment. Generally, in considering a motion to dismiss under Rule 12(b)(6), the Court may not consider matters outside the pleadings. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). However, the District Court has the ability to consider extrinsic matters on a motion to dismiss under Rule 12(b)(6), converting it to a motion for summary judgment under Rule 56. *United States v. Purdue Pharma L.P.*, 600 F.3d 319, 325-26 (4th Cir. 2010) (citing *Bosiger v. US Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007)). And yet, in general, "summary judgment should only be granted after adequate time for discovery." *McCray v. Md. Dept. of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex*, 477 U.S. at 322-23. The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

As explained below, the Court finds that CCC is not the proper party for the Barnetts' claim, as the misconduct allegedly committed by Mr. Chiles would have intrinsically occurred when he was acting with final policymaking authority on behalf of the State rather than the county commission. Accordingly, the Motion to Dismiss is **GRANTED**.

The Complaint delineates a variety of material which the Barnetts argue was suppressed in violation of their rights under *Brady* and/or *Giglio*. *See* Compl. ¶¶ 336-39; *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972). Relying on these allegations of suppression, the Barnetts have asserted that CCC violated their Fourteenth Amendment right to a

fair trial in two ways. *See* Compl. ¶¶ 336-42. First, they allege that Mr. Chiles "acting in his capacity as a final municipal policymaker for [CCC] with respect to prosecutorial matters, made a deliberate choice not to disclose [*Brady* material] in bad faith and/or with deliberate indifference to the known risk" that it would violate Plaintiffs' rights. *Id*. ¶ 340. Second, they allege that Mr. Chiles "acting in his capacity as final municipal policymaker for [CCC] in supervising and training attorneys in the Prosecuting Attorney's Office, and acting in bad faith and/or with deliberate indifference to the known risk that it would violate Nathan and Philip Barnett's constitutional rights, chose not to correct [Ms. Howard's] misrepresentation that no exculpatory evidence existed and/or their failure to disclose such evidence." *Id*. ¶ 341. Accordingly, Plaintiffs have raised two theories of liability as to CCC, both of which are premised on the actions or inaction of Mr. Chiles in his role as Prosecuting Attorney, which the Barnetts assert is a final municipal policymaker role for CCC pursuant to *Monell*. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

In its Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, CCC argues that the Complaint fails to state a claim for relief as a matter of law, as CCC is not legally responsible for the actions of CCPA, or, accordingly, for Mr. Chiles as the head of CCPA. *See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF No. 30. In forwarding this argument, CCC relies heavily upon an opinion in a factually similar case—*Gardner v. Kanawha County Commission*—in which summary judgment was granted in part based on an affidavit from a former prosecuting attorney, who averred that the Kanawha County Commission was not involved in the relevant prosecution. *Id*. at 11-12; *see Gardner v. Kanawha Cnty. Comm'n*, No. 2:17-cv-03934, 2020 WL 7264464, at *9 (S.D.W. Va. Dec. 10, 2020). Accordingly, CCC has attached a similar affidavit to its Motion and has asked this Court, in the alternative, to grant it summary judgment.

*See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss at 10-13 & Ex. A, "Affidavit of Christopher Chiles," ECF No. 29-1.

Political subdivisions may be held liable for constitutional violations under § 1983. *Monell*, 436 U.S. at 690. While a political subdivision is amenable to so-called *Monell* suits under § 1983, it is not subject to vicarious liability for the actions of its employees. *Id*. at 694; *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Rather, a political subdivision is only liable when plaintiffs can demonstrate "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)). Additionally, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Davison v. Randall*, 912 F.3d 666, 689 (4th Cir. 2019) (quoting *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018)). "[I]n assessing whether a municipality may be held liable for constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id*. (internal quotation marks omitted). "The question of who possesses final policymaking authority is one of state law." *Hunter*, 897 F.3d at 555 (citing *Riddick v. Sch. Bd. Of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)); *accord Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). However, unlike political subdivisions, states are not "persons" within the ambit of § 1983 and therefore may not be held liable pursuant to *Monell*. *See Conley v. Ryan*, 92 F. Supp. 3d 502, 520 (S.D.W. Va. 2015) (citing *Pembaur*, 475 U.S. at 485).

Admittedly, prior cases have found West Virginia county commissions to be the proper parties for suit where prosecuting attorney's offices are alleged to have violated constitutional

rights. It is undisputable that prosecuting attorney's offices may not be sued. *See, e.g.*, *Launi v. Hampshire Cnty. Prosecuting Atty's Office*, 480 F. Supp. 3d 724, 731-32 (N.D.W. Va. 2020) ("Simply stated, in West Virginia a 'Prosecuting Attorney's Office' is not the proper entity to be named in a lawsuit.") (citing W. Va. Const., Art. IX § 9-1; W. Va. Code §§ 7-4-1, *et seq.*). It is likewise axiomatic in West Virginia that the county commission is the proper party for suit when claims are alleged against the county, county officers, or county officials. W. Va. Code § 7-1-1(a)(1). There are numerous cases in which the county commission was haled into court to answer for alleged misconduct committed by the county prosecutor's office. *See, e.g.*, *Launi*, 480 F. Supp. 3d at 731-32; *Frederick v. W. Va. Dept. of Health & Human Servs.*, No. 2:18-CV-01077, 2019 WL 1198027, at *46 n.26 (S.D.W. Va. Feb. 15, 2019), *report and recommendation adopted*, No. 2:18-CV-01077, 2019 WL 1173358 (S.D.W. Va. Mar. 13, 2019), *reconsideration denied*, No. 2:18-CV-01077, 2019 WL 1748532 (S.D.W. Va. Apr. 18, 2019) ("As noted in their Motion to Dismiss, neither the Jefferson County Sheriff's Department or the Jefferson County Prosecuting Attorney's Office are suable entities. Rather, the proper entity or entities to be sued are the elected officials of these offices or the Jefferson County Commission, which is the governing body of the County."). Support also exists for the analogous proposition that the county commission is the proper entity for suit where misconduct is alleged against a county sheriff's office.[4] *See, e.g.*, *Rankin v. Berkeley Cnty. Sheriff's Dept.*, 222 F. Supp. 2d 802, 807 (N.D.W. Va. 2002) (finding "that the Berkeley County Sheriff's Department is not a separate cognizable legal entity" from the Berkeley County Commission).

---

[4] County prosecuting attorney's offices and county sheriff's offices are similarly situated under West Virginia law. *See* W. Va. Const. art. IX, § 1 (establishing both offices).

Apparently upon contemplation of Plaintiffs' Response—which outlined much of the above—CCC's Reply admits that "prosecuting attorney's offices in West Virginia are not suable entities, and official capacity claims against a prosecuting attorney or a prosecuting attorney's office are, in effect claims against the county commission in which they sit." Def.'s Reply Mem. in Supp. of Mot. to Dismiss at 4 (citing *Frederick*, 2019 WL 1198027, at *46). CCC further acknowledges that Mr. Chiles would have been acting as a final policymaker when he allegedly committed the misconduct alleged in the Complaint; CCC avers that it is only disputing the issue of on behalf of *whom* Mr. Chiles was acting as a final policymaker. *Id*. at 1. CCC proceeds to argue that while it would be the proper party for suit if the suit concerned "the administrative role of the prosecuting attorney," if the prosecuting attorney was acting in his prosecutorial capacity, the proper party for suit would be the State. *Id*. at 5 (citing *Conley*, 92 F. Supp. 3d 502). In support of this proposition, CCC and *Conley* cite cases holding that county prosecutors wield the power of the State when they act to secure criminal convictions. Def.'s Reply Mem. in Supp. of Mot. to Dismiss at 3 n.1; *Conley*, 92 F. Supp. 3d at 520; *see* Syl. Pt. 2, *State ex rel. Preissler v. Dostert*, 260 S.E.2d 279 (W. Va. 1979); *State ex rel. Morrisey v. W. Va. Office of Disciplinary Counsel*, 764 S.E.2d 769, 787-88 (W. Va. 2014); *see also State ex rel. Skinner v. Dostert*, 278 S.E.2d 624, 630 (W. Va. 1981) (holding that the prosecuting attorney "secur[es] convictions on behalf of the State."). Consequently, in *Conley*, the court found that the plaintiff's § 1983 official-capacity claim against a prosecutor failed, as the prosecutor was acting on behalf of the State—a non-person under § 1983, not subject to suit. *Conley*, 92 F. Supp. 3d at 521.

Upon careful consideration, the Court agrees. While—as outlined above—West Virginia county commissions are the appropriate parties for suit where administrative misconduct by a prosecuting attorney's office is at issue, the Court finds that when prosecutorial misconduct is

alleged, the proper party for suit would be the State. In doing so, this Opinion adopts the reasoning from *Conley*: "the decisions in [*Preissler*] and *Morrisey* suggest that when acting in a prosecutorial, rather than administrative, capacity a county prosecutor acts on behalf of (and is therefore subject to the control of) the state itself." 92 F. Supp. at 520. Both *Preissler* and *Morrisey* sought the source of county prosecutors' authority and found its headwaters in the sovereign power of the State. *Preissler*, 260 S.E.2d at 287; *Morrisey*, 764 S.E.2d at 787-88. Furthermore, *Conley* surveyed the application of § 1983 to prosecutors in other states, and found that where prosecutors acted as officers of the state, suits against them were to be treated as suits against the state and therefore precluded under *Monell*. 92 F. Supp. at 520 (collecting cases).

Here, the Complaint's first theory of liability alleges direct misconduct from Mr. Chiles which would have occurred when he was acting in a prosecutorial capacity. *See* Compl. ¶¶ 337-40. This is stated in the plain language of the Complaint: "Chiles, acting in his capacity as final municipal policymaker for Cabell County *with respect to prosecutorial matters*, made a deliberate choice not to disclose" the purported *Brady* material. *Id*. ¶ 340 (emphasis added). It is also well-established that *Brady* disclosure and discovery obligations fall under the umbrella of prosecutorial functions. *See Van de Kamp v. Goldstein*, 555 U.S. 335 (2009). Accordingly, when Mr. Chiles allegedly failed to provide the Barnetts' counsel with exculpatory evidence in violation of *Brady* and/or *Giglio*, he was acting in a prosecutorial capacity. Ergo, he was acting on behalf of the state, and not on behalf of CCC.

The Barnetts's second theory of liability likewise fails. Plaintiffs allege that Mr. Chiles was acting with final policymaking authority in an administrative capacity—and therefore, on behalf of CCC rather than the State—when he allegedly failed to properly supervise Ms. Howard's purported failure to disclose *Brady* material. *See* Compl. ¶ 341; Pls.' Surreply Mem. of Law.

Unfortunately for the Barnetts, the Supreme Court has directly addressed the question of whether prosecutors act in a prosecutorial capacity or an administrative capacity when they supervise subordinate prosecutors' *Brady* disclosure requirements in *Van de Kamp v. Goldstein*, 555 U.S. 335. *Van de Kamp* held that absolute prosecutorial immunity applied in a § 1983 action to a supervising prosecutor who allegedly failed to adequately train and supervise other prosecutors accused of violating the *Brady* and *Giglio* disclosure requirements. *Id*. at 346-48. In doing so, the Supreme Court found that the "management task" of training prosecutors in *Brady*/*Giglio* disclosure was a prosecutorial action, as disclosure requirements are "directly connected with the prosecutor's basic trial advocacy duties." *Id*. at 346. Furthermore, it held that

> to permit this suit to go forward would create practical anomalies. A trial prosecutor would remain immune, even for *intentionally* failing to turn over, say *Giglio* material; but her supervisor might be liable for *negligent* training or supervision. Small prosecution offices where supervisors can personally participate in all of the cases would likewise remain immune from prosecution; but large offices, making use of more general officewide supervision and training, would not. Most important, the ease with which a plaintiff could restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision would eviscerate [prosecutorial immunity.]

*Id*. at 348 (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976) (concerning absolute prosecutorial immunity)) (emphasis in original). Were the Court today to permit the suit to progress against CCC, it would be countenancing analogous anomalies. Under the Barnetts' theory of liability, Mr. Chiles and Ms. Howard would remain immune both as prosecutors and as prosecutorial supervisor pursuant to *Van de Kamp* and *Imbler*. However, Plaintiffs would have the Court find that Mr. Chiles simultaneously donned a mantle of an administrative "final policymaker" for CCC, allowing the Court to hold CCC liable under *Monell* for the same series of Ms. Howard's alleged prosecutorial actions or inactions.

Furthermore, as *Van de Kamp* found failures to train and supervise *Brady* disclosure requirements to be sufficiently prosecutorial in nature for absolute immunity to apply, the Court would have great difficulty finding that such failures were administrative in nature for the purposes of determining for whom Mr. Chiles acted when he supervised Ms. Howard's *Brady* disclosures. While determinations of who possesses final policymaking authority are questions of state law, *Hunter*, 897 F.3d at 555, the Supreme Court of Appeals of West Virginia has adopted and applied analogous standards of absolute prosecutorial immunity. *See Mooney v. Frazier*, 693 S.E.2d 333, 345 n. 12 (W. Va. 2010) (citing *Imbler*, 424 U.S. 409). Additionally, the Supreme Court has held that "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of . . . single-incident liability" for the purposes of a deliberate indifference failure to train claim under § 1983 and *Monell*. *Connick*, 563 U.S. at 64. Accordingly, to whatever extent the Barnetts have premised their *Monell* claim upon a single-incident liability theory as to Mr. Chiles's failure to train Ms. Howard, that claim fails.[5] In *Connick*, the Court reasoned that the arduous "threshold requirements" of the legal profession—including law school, bar examinations, continuing legal education requirements, on-the-job training, and ethical and professional standards—indicate that "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id*. at 64-66. Analogously, these extensive professional thresholds and standards indicate the individual prosecutorial, rather than administrative, nature of *Brady* training and application.

---

[5] The Court interprets Plaintiffs' arguments to extend beyond a single-incident theory of liability as to improper *Brady* training, despite the Complaint's narrow focus on the incident with Ms. Howard and the briefing as to "single decision" liability. *See* Compl. ¶ 341; Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss at 8. The Complaint alleges Mr. Chiles's failure to train "attorneys" in the plural, and the "single decision" briefing can be read as more applicable to his individual "deliberate choice" not to disclose *Brady* information. *See* Compl. ¶¶ 340-41.

For all of the reasons outlined above, the Court has no difficulty in finding that Mr. Chiles was acting in a prosecutorial capacity when he allegedly failed to supervise subordinate attorneys' *Brady* disclosures. Therefore, Mr. Chiles was acting on behalf of the State, and liability may not attach to CCC under *Monell*.

The two cases cited by the Barnetts in their Surreply are not persuasive. *See* Pls.' Surreply Mem. of Law in Opp'n to Def.'s Mot. to Dismiss at 3. *Bellamy v. City of New York* held that the City was a final policymaking authority in a *Monell* action regarding a prosecuting attorney's office policies concerning disclosure of benefits received by participants in a witness protraction program and for policies regarding disciplining prosecutors for making improper closing arguments. 914 F.3d 727, 734 (2d Cir. 2019). In doing so, it rejected the argument that *Van de Kamp* demonstrated that the at-issue prosecting attorney functions were necessarily prosecutorial in nature. *Id*. at 759-60. However, it emphasized that "[t]he key flaw in the City's argument is its unsupported assumption that the circle demarcating 'prosecutorial' function for purposes of prosecutorial immunity is necessarily the same as the circle New York has chosen to demarcate state versus local prosecutorial functions." *Id*. at 760. Further, it stated that "the Supreme Court has left no doubt that state law, not federal law is responsible for demarcating that division of responsibility" for the purposes of *Monell*. *Id*. Accordingly, *Bellamy* found that the City could be held liable under New York's allocation of policymaking authority. *Id*. at 760-61. The case is baldly inapposite in that it relied solely upon New York state law. And unlike New York, West Virginia's Supreme Court has not previously affirmed that most of a prosecuting attorney's prosecutorial actions are taken on behalf of the local government. *See id*. at 758, 760. As discussed above, all West Virginia authority takes the opposite position when determining on behalf of whom a prosecuting attorney prosecutes. *See Skinner*, 278 S.E.2d at 630 ("The prosecuting attorney is

the constitutional officer charged with the responsibility of instituting prosecutions and securing convictions on behalf of the State . . . It shall be the duty of the prosecuting attorney to attend to the criminal business of the State.").

The second case cited by Plaintiffs—*Carter v. City of Philadelphia*—is equally inapplicable. *See* 181 F.3d 339 (3d Cir. 1999). Admittedly, *Carter* is factually similar in that the plaintiff served ten years in prison prior to having his conviction overturned, at which point he brought an action against named police officers and unknown policymakers within the Philadelphia District Attorney's ("DA") office. *Id*. at 342-43. Mr. Carter's action against the DA's office individuals "was premised on their failure as administrators to establish training, supervision and discipline policies" to prevent the police from obtaining perjurious "eyewitness" testimony and which would have alerted assistant DAs to the falsity of this testimony. *Id*. at 343. This alleged lack of training is not exactly analogous to the failure to make *Brady* disclosures alleged in the Barnett's Complaint. Additionally, the issue the Third Circuit addressed was not one of final policymaking authority under *Monell*, rather, it was "whether Pennsylvania's Eleventh Amendment immunity extends to Philadelphia District Attorneys" in this situation. *Id*. at 342. The *Carter* Court examined three factors, all reliant upon state law, and concluded the DA office was a county, rather than state, entity. *Id*. at 348-54. Within one of the three factors—after citing the Pennsylvania Constitution, Pennsylvania Supreme Court decisions, and Pennsylvania statutory authority to find the DA was a local entity—*Carter* assumed arguendo that somehow the DA office could still be a State authority when wielding prosecutorial power, and found in the negative as to the exact training functions at issue in the case. *Id*. at 349-53. The Court is not persuaded that this reasoning is applicable to the Barnetts' Complaint.

Finally, central to the briefing in this case is parties' vying contentions as to the import of two cases, both entitled *Gardner v. Kanawha County Commission*. Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 11-12; Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss at 8-10, 17-18; *see Gardner v. Kanawha Cnty. Comm'n*, No. 2:17-cv-03934, 2019 WL 4072712 (S.D.W. Va. Aug. 28, 2019) ("*Gardner I*"); *Gardner v. Kanawha Cnty. Comm'n*, No. 2:17-cv-03934, 2020 WL 7264464 (S.D.W. Va. Dec. 10, 2020) ("*Gardner II*"). Consequently, the Court will briefly address their applicability here. At the motion to dismiss stage, *Gardner I* allowed a *Monell* suit to progress against a county commission where the underlying misconduct alleged was committed by the prosecuting attorney's office, finding that the prosecuting attorney had final policymaking authority. 2019 WL 4072712 at *19-20. However, it did so with a caveat:

> Whether, and over what, a prosecuting attorney exercises final policymaking authority is one issue. On behalf of whom the prosecuting attorney exercises that authority is totally separate. Specifically, courts of appeals have found that certain prosecuting attorneys in some capacities exercise their policymaking authority on behalf of the state and are therefore entitled to Eleventh Amendment immunity.

*Id*. at *19 n.13. It appears that, as the issue of "on behalf of whom" the prosecuting attorney was acting was not raised, the court did not address it. As the issue is raised and addressed in the instant motion, *Gardner I*'s decision not to dismiss the claim against the county commission is inapposite.

In *Gardner II*, the court granted summary judgment to the county commission defendant, holding that the record did not demonstrate either (1) a "final policy or custom" of the Prosecuting Attorney as a final policymaker of the county commission, pursuant to *Monell*; or (2) that the county commission engaged in any direct violation of the plaintiff's constitutional rights, as it did not participate in the relevant criminal prosecution. 2020 WL 7264464, at *9-10. In reaching the second conclusion, the *Gardner II* court relied upon an affidavit submitted by the Prosecuting

Attorney, attesting to the lack of involvement of the county commission. *Id*. at *9. The court further noted that the plaintiff had not offered any evidence to refute the affidavit. *Id*. at *10. In the instant case, CCC has submitted a near-identical affidavit from Mr. Chiles. *See* ECF No. 29-1. However, the Barnetts are not alleging any direct involvement by CCC which this affidavit could controvert; they are only alleging that Mr. Chiles was acting with final policymaking authority on behalf of CCC. *See* Compl. ¶¶ 336-42. This argument has been dismissed above. Accordingly, the Court finds that *Gardner II* is inapplicable or irrelevant to the instant allegations.

As a final matter, in the alternative, CCC has asked this Court to consider the attached affidavit of Mr. Chiles, averring that CCC was not involved in any prosecutorial activity, and grant them summary judgment. As the Court has found that Plaintiffs' Complaint must be dismissed for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), it declines to further address either the affidavit or the related arguments for summary judgment.

### IV. CONCLUSION

For the forgoing reasons, the Court **GRANTS** Defendant CCC's Motion to Dismiss. ECF No. 29. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:  March 22, 2023

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE